| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )     <u>ORDER</u><br>) |
| GLOBAL TEAM ELECTRIC, LLC, DARMELLEON LEE, and CALVIN GODWIN, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**THIS MATTER** comes before the Court on Plaintiff's motion for a temporary restraining order ("TRO"). (Doc. No. 5.) Having considered the verified complaint, exhibits, briefs, and oral arguments during a hearing on this motion, the Court grants in part Plaintiff's motion and enters a limited TRO.

I.     FACTS AND PROCEDURAL HISTORY

Plaintiff Great American Insurance Company is licensed to conduct business as a contract surety in North Carolina and is in the business of issuing performance and payment bonds on behalf of construction contractors. (Doc. No. 1, ¶¶ 10–11.) Defendant Global Team Electric, LLC ("GTE") engages in commercial electrical contracting in North Carolina. (Doc. No. 1, ¶ 12.) Defendants Darmelleon Lee and Calvin Goodwin are the founding members of GTE. (Doc. No. 1, ¶ 2.)

To obtain construction contracts with owners and general contractors for North Carolina public construction projects that exceed a certain monetary threshold,

contractors such as GTE are required by statute to procure performance and payment bonds guaranteeing satisfactory performance of the contract and prompt payment. See N.C. Gen. Stat. § 44A-26. Such bonds were required for construction contracts for the Merancas Phase IV Classroom Building project at Central Piedmont Community College ("CPCC"), and GTE requested that Plaintiff execute bonds on GTE's behalf for the CPCC project. (Doc. No. 1, ¶¶ 14, 19, 20.)

As consideration for Plaintiff's issuance of the bonds, Plaintiff and Defendants executed an Agreement of Indemnity (the "Indemnity Agreement") on July 24, 2019. (Doc. No. 1, ¶ 15; Doc. No. 1-1.) The Indemnity Agreement binds the parties with respect to all bonds previously or in the future executed by Plaintiff on behalf of any Defendant. (Doc. No. 1-1, ¶ 1.) The second paragraph of the Indemnity Agreement states:

> [Defendants], jointly and severally, shall exonerate, indemnify, hold harmless and keep [Plaintiff] indemnified from and against any and all liability for losses, costs, and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs, consultant or expert fees, and counsel fees) and from and against any and all such losses and/or expenses which [Plaintiff] may sustain and incur: (1) By reason of being requested to execute or procure, or having executed or procured the execution of Bonds on behalf of any of the [Defendants] . . . . Payment by reason of the aforesaid causes shall be made to [Plaintiff] by [Defendants], upon demand by [Plaintiff], as soon as liability exists or is asserted against [Plaintiff], whether or not [Plaintiff] shall have made any payment therefor.

(Doc. No. 1-1, ¶ 2.)

In the third paragraph of the Indemnity Agreement, Defendants agreed to

> assign, transfer and set over to [Plaintiff], as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of [Defendants] to [Plaintiff], whether

2

heretofore or hereafter incurred, the assignment to become effective retroactive to the date of the first Bond, but only in the event of (1) any abandonment, forfeiture or breach or alleged breach of any contracts referred to in the Bonds or of any breach or alleged breach of any Bonds; . . . :

(a) All the rights of [Defendants] in, and growing in any manner out of the Bonds or any contracts referred to in the Bonds;

(b) All the rights, title and interest of [Defendants] in and to all machinery, equipment, vehicles, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites;

(c) All the rights, title and interest of [Defendants] in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts;

(d) All actions, causes of actions, claims and/or the proceeds therefrom and any demands whatsoever which [Defendants] may have or acquire against any party, including but not limited to owners, obligees, subcontractors, laborers or materialmen, architects, engineers or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any party including, but not limited to, prime contractors, subcontractors, laborers, or materialmen;

(e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which [Defendants] ha[ve] an interest;

(f) any and all accounts receivable, marketable securities, rents, proceeds of sale, instruments, chattel paper, letters of credit, documents of title, bills of lading, federal tax refunds, state and local tax refunds, furniture and fixtures, inventory, and general intangibles;

(g) any and all policies of insurance;

(h) all intellectual property, including licenses, patents, copyrights, and trade secrets;

(i) all limited or general partnership interests.

(Doc. No. 1-1, ¶ 3.)

Further, the Indemnity Agreement granted Plaintiff "the right to examine and copy the books, records, and accounts" of Defendants at any time. (Doc. No. 1-1, ¶ 10.)

Two days after the parties executed the Indemnity Agreement, Plaintiff issued a performance bond and a payment bond on behalf of GTE in connection with GTE's construction contract with CPCC, each in the penal amount of $1,986,651. (Doc. No. 1, ¶ 20; Doc. No. 1-2.)

On March 13, 2020, CPCC sent a notice to cure letter to GTE. (Doc. No. 1-3.) The letter declared GTE to be in default of its contract for the CPCC project due to its failure to execute its required scope of work in accordance with the project schedule. The letter informed GTE that if it did not complete the required work by March 19, 2020, CPCC would invoke its contractual right under Article 28 Owner's Right to Do Work and supplement the outstanding work.

On or about March 23, 2020, Lee unilaterally removed GTE's labor force from the CPCC project, assertedly as a precaution against COVID-19. (Doc. No. 1, ¶ 22; Doc. No. 1-5.) Godwin informed Plaintiff that Lee's action was taken without Godwin's consultation or approval. (Doc. No. 1, ¶ 23.)

On March 26, 2020, Rodgers Builders, Inc., the general contractor on the CPCC project, sent a notice of default letter to GTE. (Doc. No. 1-4.) The letter stated that GTE had failed to meet the requirements set forth in the March 13 notice to cure

4

letter and, as a result, CPCC would invoke its contractual right under Article 28 Owner's Right to Do Work and supplement the outstanding work.

On April 2, 2020, Godwin informed Rodgers that GTE would not be completing its work on the CPCC project and that Rodgers would need to move forward with a replacement contractor, Miller Electric Company. (Doc. No. 1, ¶ 25; Doc. No. 1-11, Attachment 4.)

On April 3, 2020, Godwin informed Plaintiff that Lee had blocked Godwin from access to certain financial books and records of GTE maintained by its accountant, deleted all email in GTE's account, and changed the password for GTE's company email account. (Doc. No. 1, ¶ 26.) That same day, Plaintiff delivered a letter to Defendants demanding preservation of GTE's financial accounts, financial records, tools and equipment, other assets, and CPCC project records. (Doc. No. 1, ¶ 27; Doc. No. 1-7.) The letter further demanded that GTE's assets be set over to Plaintiff in accordance with the third paragraph of the Indemnity Agreement. (Doc. No. 1-7.) Godwin responded to the letter, stating that no payments for the CPCC project had been received as of January 2020 and any monies due for the project would be forwarded to Plaintiff. (Doc. No. 1-8.) Plaintiff has not received a response from Lee. (Doc. No. 1, ¶ 28.)

On April 6, 2020, Plaintiff received a payment bond claim from Consolidated Electrical Distributors, Inc. ("CED"), one of GTE's subcontractors on the CPCC project. (Doc. No. 1, ¶ 30; Doc. No. 1-9.) CED alleged that GTE failed to pay CED $335,757.77 for materials and supplies that CED furnished to the CPCC project and

demanded payment from Plaintiff. (Doc. No. 1-9.) Plaintiff then delivered a second letter to Defendants on April 6, 2020 in which Plaintiff demanded that Defendants provide Plaintiff with cash collateral in the amount of $335,757.77 in light of the payment bond claim asserted by CED. (Doc. No. 1, ¶ 32; Doc. No. 1-10.) Defendants have neither responded to the April 6 demand letter nor posted any collateral. (Doc. No. 1, ¶¶ 33–34.)

In a letter dated April 9, 2020, Rodgers terminated GTE's contract for the CPCC project. (Doc. No. 1, ¶ 36; Doc. No. 1-11.) Miller Electric, the replacement contractor, informed Plaintiff on April 10, 2020 that its estimated cost to complete GTE's work on the CPCC project is $1.378 million. (Doc. No. 1, ¶ 37.) Rodgers had previously informed Plaintiff that the balance on GTE's contract for the CPCC project was $357,738.55. (Doc. No. 1, ¶ 37.) Accordingly, if Miller Electric completes GTE's work on the project at the estimated $1.378 million quoted to Plaintiff, Plaintiff anticipates that CPCC or Rodgers will assert a performance bond claim in an amount no less than $1,020,261.45. (Doc. No. 1, ¶ 37.)

Plaintiff filed its verified complaint on April 13, 2020 asserting three claims for relief: (1) "Breach of Contract/Specific Performance – Failure to Post Collateral Security," (2) quia timet and injunctive relief, and (3) "Breach of Contract – Failure to Exonerate and to Indemnify." (Doc. No. 1, at 12, 14, 17.) Plaintiff filed its motion for a TRO and a preliminary injunction on April 14, 2020. (Doc. No. 5.)

On April 16, 2020, Godwin sent an email to a person named Daniel Oaks asserting that Lee had embezzled over $150,000 in GTE assets. (Doc. No. 11, ¶ 7;

6

Doc. No. 11-3.) Attached to Godwin's email were GTE's payroll records. Oaks forwarded the email to Plaintiff that same day. (Doc. No. 11, ¶ 7; Doc. No. 11-3.) Plaintiff reviewed the payroll records attached to Godwin's email and determined that during the fourteen-month period from February 3, 2019 through April 2, 2020, Lee either disbursed to himself or arranged to have disbursed to him $141,000 in purported fuel expenses and nearly $11,000 in other unaccounted for disbursements. (Doc. No. 11, ¶ 8; Doc. No. 11-4.)

On April 20, 2020, Rodgers forwarded to Plaintiff a Notice of Intent to File a Lien from Nixon Power Services, LLC, one of GTE's subcontractors on the CPCC project. (Doc. No. 11, ¶ 11; Doc. No. 11-9.) The notice alleges that GTE has failed to pay Nixon $64,087.24 for labor and materials Nixon furnished to the CPCC project. (Doc. No. 11, ¶ 11; Doc. No. 11-9.) The notice states that if payment is not made within ten days, Nixon will file a claim of lien. (Doc. No. 11-9.) When Plaintiff forwarded Nixon's notice to Godwin's GTE email address, Plaintiff received an auto-response stating "[a]s of Friday, April 17, 2020, [GTE] has closed it's [sic] doors due to extenuating circumstances. Please accept this message as your official notice. This email account will no longer be monitored and will be deactivated on Friday, April 24, 2020." (Doc. No. 11, ¶ 12; Doc. No. 11-10.)

On April 22, 2020, Rodgers forwarded to Plaintiff forty-six unpaid invoices from Shealy Electrical Wholesalers, another subcontractor for GTE on the CPCC project. (Doc. No. 11, ¶ 13.) The unpaid invoices total $98,904.28. (Doc. No. 11, ¶ 13; Doc. No. 11-11.)

7

The Court held a hearing on Plaintiff's request for a TRO on April 24, 2020 at which counsel for Plaintiff and counsel for Godwin appeared.[1]

## II. LEGAL STANDARD

"The standard for granting either a TRO or a preliminary injunction is the same and is well established." Paradies Shops, LLC v. Brookstone Charlotte, LLC, No. 3:19-cv-00631, 2019 U.S. Dist. LEXIS 204756, at *2–3 (W.D.N.C. Nov. 26, 2019). A party seeking a TRO or a preliminary injunction must demonstrate all of the following: (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the TRO or injunction is in the public interest. Accident, Injury & Rehab., PC v. Azar, 943 F.3d 195, 201 (4th Cir. 2019).

## III. DISCUSSION

Although a court can issue a TRO without notice, the Court notes at the outset that Plaintiff has submitted evidence showing it provided Defendants with notice of the TRO motion and hearing. Plaintiff's counsel submitted a declaration stating that copies of all pleadings, including the TRO motion, were sent to Defendants by both Federal Express and First Class Mail. (Doc. No. 9, ¶ 4.) Plaintiff's counsel then submitted an affidavit of service accompanied by Federal Express proof-of-delivery receipts showing that Defendants received the documents on April 15 and April 16, 2020. (Doc. No. 10.) Plaintiff's counsel also notified Defendants of the TRO hearing, and Godwin subsequently retained counsel who appeared at the hearing on his

---

[1] Due to the COVID-19 global pandemic, the Court held the hearing by video.

behalf.

Plaintiff seeks a TRO prohibiting Defendants from selling, transferring, disposing of, or otherwise diverting or encumbering any assets that could be pledged as collateral pursuant to the Indemnity Agreement, except as to necessary expenses paid in the ordinary course of business, and directing Defendants to immediately allow Plaintiff full and complete access to GTE's books, records, and accounts.

### A. Likelihood of Success

Plaintiff seeks a TRO in connection with its contract claims and, accordingly, it is on these claims that Plaintiff must demonstrate a likelihood of success. To demonstrate a likelihood of success, Plaintiff must make a clear showing that it is likely to succeed at trial; however, Plaintiff "need not show a certainty of success." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013).

#### 1. Breach of Contract/Specific Performance – Failure to Post Collateral Security

Plaintiff's first contract claim alleges that Defendants breached the Indemnity Agreement by failing to post any collateral security in response to Plaintiff's April 6 demand letter. Plaintiff seeks an order of specific performance requiring Defendants, jointly and severally, to immediately post collateral security in the amount of $1,356,019.22.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000). When the language of a contract is plain and unambiguous, there is no room for construction—the contract must be

9

interpreted and enforced as written. State v. Philip Morris USA Inc., 685 S.E.2d 85, 91 (N.C. 2009). "To obtain the remedy of specific performance for the breach, the plaintiff 'must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.'" First Nat'l Ins. Co. of Am. v. Sappah Bros., Inc., 771 F. Supp. 2d 569, 572 (E.D.N.C. 2011) (quoting Ball v. Maynard, 645 S.E.2d 890, 896 (N.C. Ct. App. 2007)).

Plaintiff has come forward with evidence that the Indemnity Agreement constitutes a valid contract between the parties. Under the third paragraph of the Indemnity Agreement, Defendants agreed that if they abandoned or breached any of the bonded contracts, they would assign, transfer, and set over various assets, rights, and interests to Plaintiff as collateral. Plaintiff has submitted evidence tending to show that GTE breached its bonded contract with CPCC. (Doc. Nos. 1-3, 1-4, 1-5, 1-11.) Accordingly, under the third paragraph of the Indemnity Agreement, Defendants were obligated to assign, transfer, and set over collateral security to Plaintiff. Plaintiff demanded such collateral security from Defendants by letter dated April 3, but Defendants have not posted any collateral. (Doc. No. 1, ¶¶ 29, 33–34, 41; Doc. No. 1-7.) Therefore, Plaintiff has come forward with evidence that Defendants breached the Indemnity Agreement by failing to post collateral security, and Plaintiff has demonstrated a likelihood of success on its first claim seeking enforcement of the collateral security provision.

### 2. Breach of Contract – Failure to Exonerate and to Indemnify

Plaintiff's second contract claim is based on Defendants' failure to pay Plaintiff

10

for losses upon demand. Under the second paragraph of the Indemnity Agreement, Defendants agreed to indemnify Plaintiff from all losses, costs, and expenses that Plaintiff may incur by reason of having executed the bonds on behalf of Defendants, and Defendants agreed to do so on Plaintiff's demand as soon as liability existed or was asserted against Plaintiff. Liability was asserted against Plaintiff when CED made a payment bond claim in the amount of $335,757.77. (Doc. No. 1-9.) Thereafter, Plaintiff demanded from Defendants cash collateral in the amount of CED's payment bond claim. (Doc. No. 1-10.) Defendants have neither responded to Plaintiff's demand nor provided the cash collateral. (Doc. No. 1, ¶¶ 33–34.) Therefore, Plaintiff has come forward with evidence that Defendants breached the Indemnity Agreement by failing to provide the cash collateral, and Plaintiff has demonstrated a likelihood of success on its third claim for breach of contract.

### B.  Irreparable Harm

Next, Plaintiff must demonstrate that it is likely to suffer irreparable harm in the absence of preliminary relief. Generally, irreparable harm is suffered when an award of monetary damages would be inadequate. XL Specialty Ins. Co. v. Truland, No. 1:14cv1058, 2014 U.S. Dist. LEXIS 119096, at *7 (E.D. Va. Aug. 21, 2014). "Courts routinely recognize that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages." First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 574 (quotation marks omitted). This is so because the surety "holds a bargained-for right to collateral security and, without enforcement of such right, assumes the risk of becoming a general unsecured creditor and of being unable to

11

collect a subsequent judgment in its favor." Int'l Fid. Ins. Co. v. Waterfront Grp. NC, LLC, No. 3:11-cv-00116, 2011 U.S. Dist. LEXIS 116311, at *13 (W.D.N.C. Oct. 6, 2011). Therefore, Plaintiff has demonstrated it is likely to suffer irreparable harm absent preliminary relief. See XL Specialty Ins. Co., 2014 U.S. Dist. LEXIS 119096, at *9 (concluding that plaintiff-sureties were likely to suffer irreparable harm absent temporary injunctive relief and entering a TRO prohibiting defendants from transferring assets that could be pledged as collateral security); First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 575 (concluding that plaintiff-surety was likely to suffer irreparable harm in the absence of preliminary injunctive relief in the form of collateral security); Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *10 (concluding that absent a preliminary injunction, plaintiff-surety was likely to suffer irreparable harm in the form of loss of collateral to satisfy defendants' collateral security obligation).

### C. Balance of Equities

Plaintiff must also demonstrate that the balance of equities tips in its favor. Absent preliminary relief, Plaintiff "would bear the entire loss on the bond claims without being collateralized, a right to which it explicitly bargained in the indemnity agreement." First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 575. Granting preliminary relief "would require Defendants to perform as they contractually-obligated themselves to do." Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *13. The balance of equities thus tips in favor of Plaintiff. XL Specialty Ins. Co., 2014 U.S. Dist. LEXIS 119096, at *9 (concluding that the balance of equities tipped in favor of

surety-plaintiffs); First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576 (same); Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *13–14 (same).

### D. Public Interest

Last, Plaintiff must show that a TRO is in the public interest. "The public has an interest in ensuring that contracts are enforced." UBS PaineWebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002). "Furthermore, enforcing the collateral security provision of an indemnity agreement in the construction setting serves an important public interest: to encourage sureties to continue to provide bonds for public construction contracts." First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576. The public interest thus supports the issuance of temporary injunctive relief in this case. XL Specialty Ins. Co., 2014 U.S. Dist. LEXIS 119096, at *10 (concluding that the public interest supported issuing a TRO prohibiting defendants from transferring any assets that could be pledged as collateral security); First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576 (concluding that the public interest supported issuing a preliminary injunction directing defendants to deposit collateral security with surety-plaintiff); Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *14 (same).

Therefore, the Court will issue a limited TRO, the complete terms of which are set forth below, prohibiting Defendants from transferring or encumbering assets that could be pledged as collateral under the Indemnity Agreement. The Court will consider Plaintiff's request for injunctive relief requiring Defendants to provide Plaintiff with access to Defendants' books, records, and accounts at the preliminary injunction stage.

13

### E. Bond

Rule 65(c) states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond is within the district court's discretion. Pashby, 709 F.3d at 332. In determining the amount, "the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999). Thus, "[w]here the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." Id.

Here, as the TRO merely prohibits Defendants from taking action that would infringe on Plaintiff's contractual right to collateral, the Court finds that a minimal bond in the amount of $1,000 is appropriate.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's motion for a TRO, (Doc. No. 5), is **GRANTED in part**. Defendants and their officers, agents, servants, employees, and attorneys, and anyone acting in concert with them, are hereby immediately restrained and enjoined from selling, transferring, disposing of, or otherwise diverting or encumbering any assets that could be pledged as collateral pursuant to

the third paragraph of the Indemnity Agreement, recited above—which specifically includes but is not limited to any bank funds of GTE currently in the possession of any Defendant, as well as any assets purchased with such funds—except as to necessary expenses paid in the ordinary course of business.

**IT IS FURTHER ORDERED** that Plaintiff post or otherwise provide security in the principal amount of one thousand dollars ($1,000) for the payment of such costs and damages as may be incurred or suffered by Defendants if it is later found that Defendants were wrongfully enjoined or restrained by this Order.

**IT IS FURTHER ORDERED** that this Order will expire at 2:00 p.m. on May 8, 2020. The Court will hold a hearing on Plaintiff's request for a preliminary injunction on May 8, 2020 at 2:00 p.m.

Signed: April 24, 2020

_____
Robert J. Conrad, Jr.
United States District Judge