UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-00218-RJC-DSC

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GLOBAL TEAM ELECTRIC, LLC, )<br>DARMELLEON LEE, and CALVIN )<br>GODWIN, )<br>)<br>Defendants. ) | <u>ORDER</u> |

**THIS MATTER** comes before the Court on Plaintiff's motion for a preliminary injunction, (Doc. No. 5), and Plaintiff's motion to expedite discovery, (Doc. No. 7).

I.     **FACTS AND PROCEDURAL HISTORY**

Plaintiff Great American Insurance Company is licensed to conduct business as a contract surety in North Carolina and is in the business of issuing performance and payment bonds on behalf of construction contractors. (Doc. No. 1, ¶¶ 10–11.) Defendant Global Team Electric, LLC ("GTE") engages in commercial electrical contracting in North Carolina. (Doc. No. 1, ¶ 12.) Defendants Darmelleon Lee and Calvin Godwin are the founding members of GTE. (Doc. No. 1, ¶ 2.)

To obtain construction contracts with owners and general contractors for North Carolina public construction projects that exceed a certain monetary threshold, contractors such as GTE are required by statute to procure performance and payment bonds guaranteeing satisfactory performance of the contract and prompt payment.

See N.C. Gen. Stat. § 44A-26. Such bonds were required for construction contracts for the Merancas Phase IV Classroom Building project at Central Piedmont Community College ("CPCC"), and GTE requested that Plaintiff execute bonds on GTE's behalf for the CPCC project. (Doc. No. 1, ¶¶ 14, 19, 20.)

As consideration for Plaintiff's issuance of the bonds, Plaintiff and Defendants executed an Agreement of Indemnity (the "Indemnity Agreement") on July 24, 2019. (Doc. No. 1, ¶ 15; Doc. No. 1-1.) The Indemnity Agreement binds the parties with respect to all bonds previously or in the future executed by Plaintiff on behalf of any Defendant. (Doc. No. 1-1, ¶ 1.) The second paragraph of the Indemnity Agreement states:

> [Defendants], jointly and severally, shall exonerate, indemnify, hold harmless and keep [Plaintiff] indemnified from and against any and all liability for losses, costs, and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs, consultant or expert fees, and counsel fees) and from and against any and all such losses and/or expenses which [Plaintiff] may sustain and incur: (1) By reason of being requested to execute or procure, or having executed or procured the execution of Bonds on behalf of any of the [Defendants] . . . . Payment by reason of the aforesaid causes shall be made to [Plaintiff] by [Defendants], upon demand by [Plaintiff], as soon as liability exists or is asserted against [Plaintiff], whether or not [Plaintiff] shall have made any payment therefor. The amount of such payment to [Plaintiff] by [Defendants] shall be determined by [Plaintiff] and [Plaintiff]'s demand for payment hereunder may, at [Plaintiff]'s option, be in addition to and not in lieu of or substitution for any other collateral that may have been previously deposited with [Plaintiff] by or on behalf of [Defendants]. [Plaintiff] shall have the right to use the payment, or any part thereof, in payment or settlement of any liability, loss or expense for which [Defendants] would be obligated to indemnify [Plaintiff] under the terms of this Agreement. . . . [Defendants] shall be entitled to the refund of any unused portion of the payment upon termination of the liability of [Plaintiff] on all Bonds and the performance by [Defendants]

of all obligations to [Plaintiff] under the terms of this Agreement.[1]

(Doc. No. 1-1, ¶ 2.)

Further, the Indemnity Agreement grants Plaintiff "the right to examine and copy the books, records, and accounts" of Defendants at any time. (Doc. No. 1-1, ¶ 10.)

Two days after the parties executed the Indemnity Agreement, Plaintiff issued a performance bond and a payment bond on behalf of GTE in connection with GTE's construction contract with CPCC, each in the penal amount of $1,986,651.00. (Doc. No. 1, ¶ 20; Doc. No. 1-2.)

On March 13, 2020, CPCC sent a notice to cure letter to GTE. (Doc. No. 1-3.) The letter declared GTE to be in default of its contract for the CPCC project due to its failure to execute its required scope of work in accordance with the project schedule. The letter informed GTE that if it did not complete the required work by March 19, 2020, CPCC would invoke its contractual right under Article 28 Owner's Right to Do Work and supplement the outstanding work.

On or about March 23, 2020, Lee unilaterally removed GTE's labor force from the CPCC project, assertedly as a precaution against COVID-19. (Doc. No. 1, ¶ 22; Doc. No. 1-5.) Godwin informed Plaintiff that Lee's action was taken without Godwin's consultation or approval. (Doc. No. 1, ¶ 23.)

On March 26, 2020, Rodgers Builders, Inc., the general contractor on the CPCC project, sent a notice of default letter to GTE. (Doc. No. 1-4.) The letter stated that

---

[1] Such a provision is often referred to as a collateral security provision. <u>First Nat'l Ins. Co. of Am. v. Sappah Bros., Inc.</u>, 771 F. Supp. 2d 569, 572 & n.2 (E.D.N.C. 2011).

GTE had failed to meet the requirements set forth in the March 13 notice to cure letter and, as a result, CPCC would invoke its contractual right under Article 28 Owner's Right to Do Work and supplement the outstanding work.

On March 30, 2020, Godwin transferred approximately $15,000.00 from GTE's account into another account. (Doc. No. 17-1, ¶ 10.) Godwin asserts that he transferred the funds to protect them from further misappropriation by Lee. (Doc. No. 17-1, ¶ 10.) The funds were used to pay GTE's outstanding payroll obligations and are depleted as a result. (Doc. No. 17-1, ¶ 10.)

On April 1, 2020, Godwin discovered that he was unable to access GTE's account records through Sevrina Tax & Business Services, Inc., the accounting firm who maintains GTE's books and records. (Doc. No. 17-1, ¶¶ 6–7.) On the same day, Godwin also discovered that he was locked out of GTE's email accounts, including his individual GTE email account and the general company account. (Doc. No. 17-1, ¶ 11.) Godwin informed Plaintiff on April 3, 2020 that he had been blocked from accessing GTE's records and email. (Doc. No. 1, ¶ 26.)

On April 2, 2020, Godwin informed Rodgers that GTE would not be completing its work on the CPCC project and that Rodgers would need to move forward with a replacement contractor, Miller Electric Company. (Doc. No. 1, ¶ 25; Doc. No. 1-11, Attachment 4.)

On April 3, 2020, Plaintiff delivered a letter to Defendants demanding preservation of GTE's financial accounts, financial records, tools and equipment, other assets, and CPCC project records. (Doc. No. 1, ¶ 27; Doc. No. 1-7.) Godwin

4

responded to the letter, stating that no payments for the CPCC project had been received as of January 2020 and any monies due for the project would be forwarded to Plaintiff. (Doc. No. 1-8.) Plaintiff has not received a response from Lee. (Doc. No. 1, ¶ 28.)

On April 6, 2020, Plaintiff received a payment bond claim from Consolidated Electrical Distributors, Inc. ("CED"), one of GTE's subcontractors on the CPCC project. (Doc. No. 1, ¶ 30; Doc. No. 1-9.) CED alleged that GTE failed to pay CED $335,757.77 for materials and supplies that CED furnished to the CPCC project and demanded payment from Plaintiff. (Doc. No. 1-9.) Plaintiff then delivered a second letter to Defendants on April 6, 2020 in which Plaintiff demanded that Defendants provide Plaintiff with collateral in the amount of $335,757.77 in the form of cash or an irrevocable letter of credit issued by a bank approved by Plaintiff. (Doc. No. 1, ¶ 32; Doc. No. 1-10.) Defendants have neither responded to the April 6 demand letter nor posted any collateral. (Doc. No. 1, ¶¶ 33–34.)

In a letter dated April 9, 2020, Rodgers terminated GTE's contract for the CPCC project. (Doc. No. 1, ¶ 36; Doc. No. 1-11.) Miller Electric, the replacement contractor, informed Plaintiff on April 10, 2020 that its estimated cost to complete GTE's work on the CPCC project is $1.378 million. (Doc. No. 1, ¶ 37.) Rodgers had previously informed Plaintiff that the balance on GTE's contract for the CPCC project was $357,738.55. (Doc. No. 1, ¶ 37.) Accordingly, if Miller Electric completes GTE's work on the project at the estimated $1.378 million quoted to Plaintiff, Plaintiff anticipates that CPCC or Rodgers will assert a performance bond claim in an amount

5

no less than $1,020,261.45. (Doc. No. 1, ¶ 37.)

Plaintiff filed its verified complaint on April 13, 2020 asserting three claims for relief: (1) "Breach of Contract/Specific Performance – Failure to Post Collateral Security," (2) quia timet and injunctive relief, and (3) "Breach of Contract – Failure to Exonerate and to Indemnify." (Doc. No. 1, at 12, 14, 17.) Plaintiff filed its motion for a TRO and a preliminary injunction on April 14, 2020. (Doc. No. 5.)

On April 16, 2020, Godwin sent an email with GTE's payroll records to a person named Daniel Oaks. (Doc. No. 11, ¶ 7; Doc. No. 11-3.) Godwin was able to access GTE's payroll records through Paychex, GTE's online payroll processor, on April 6, 2020. (Doc. No. 17-1, ¶ 8.) Based on his review of the records, Godwin believes that Lee embezzled over $150,000.00 from GTE. (Doc. No. 17-1, ¶ 9.) Oaks forwarded the email and attached records to Plaintiff that same day. (Doc. No. 11, ¶ 7; Doc. No. 11-3.) Plaintiff reviewed the payroll records attached to Godwin's email and likewise determined that during the fourteen-month period from February 3, 2019 through April 2, 2020, Lee either disbursed to himself or arranged to have disbursed to him $141,000.00 in purported fuel expenses and nearly $11,000.00 in other unaccounted for disbursements. (Doc. No. 11, ¶ 8; Doc. No. 11-4.)

On April 20, 2020, Rodgers forwarded to Plaintiff a Notice of Intent to File a Lien from Nixon Power Services, LLC, one of GTE's subcontractors on the CPCC project. (Doc. No. 11, ¶ 11; Doc. No. 11-9.) The notice alleged that GTE failed to pay Nixon $64,087.24 for labor and materials Nixon furnished to the CPCC project. (Doc. No. 11, ¶ 11; Doc. No. 11-9.) The notice stated that if payment was not made within

ten days, Nixon would file a claim of lien. (Doc. No. 11-9.) When Plaintiff forwarded Nixon's notice to Godwin's GTE email address, Plaintiff received an auto-response stating "[a]s of Friday, April 17, 2020, [GTE] has closed it's [sic] doors due to extenuating circumstances. Please accept this message as your official notice. This email account will no longer be monitored and will be deactivated on Friday, April 24, 2020." (Doc. No. 11, ¶ 12; Doc. No. 11-10.)

On April 22, 2020, Rodgers forwarded to Plaintiff forty-six unpaid invoices from Shealy Electrical Wholesalers, another subcontractor for GTE on the CPCC project. (Doc. No. 11, ¶ 13.) The unpaid invoices total $98,904.28. (Doc. No. 11, ¶ 13; Doc. No. 11-11.)

On April 24, 2020, the Court held a hearing on Plaintiff's request for a TRO, and on April 27, 2020, the Court entered a TRO. The Court held a hearing on Plaintiff's request for a preliminary injunction on May 8, 2020 at which counsel for Plaintiff and Godwin appeared.[2] Despite having notice of the motion and hearing, (Doc. Nos. 9, 10, 20), neither Lee nor GTE appeared at the hearing.

## II. MOTION FOR PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must demonstrate all of the following: (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. Accident, Injury & Rehab., PC v. Azar, 943 F.3d 195, 201 (4th Cir. 2019). "A preliminary injunction may be characterized as

---

[2] Due to the COVID-19 global pandemic, the Court held the hearing by video.

being either prohibitory or mandatory." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 235 (4th Cir. 2014). "Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). On the other hand, "mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." E. Tenn. Natural Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004). The Fourth Circuit "has defined the status quo as the last uncontested status between the parties which preceded the controversy." Pashby, 709 F.3d at 320 (quotation marks omitted). "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994). The Fourth Circuit applies a heightened standard of review to mandatory preliminary injunctions. Pashby, 709 F.3d at 319.

Plaintiff seeks a preliminary injunction that (1) prohibits Defendants from selling, transferring, disposing of, or otherwise diverting or encumbering any assets that could be pledged as collateral pursuant to the Indemnity Agreement, except as to necessary expenses paid in the ordinary course of business; (2) directs Defendants to immediately furnish to Plaintiff a full and complete accounting of any and all assets owned by GTE since July 24, 2019 and their disposition; (3) directs Defendants to immediately allow Plaintiff full and complete access to all financial books, records, and accounts that are maintained by GTE or on its behalf; and (4) directs Defendants

to deposit with Plaintiff collateral security in the amount of $1,519,010.74.

## A. Likelihood of Success

Plaintiff's requested preliminary injunctive relief stems from its first and second claims and, thus, it is on those claims that Plaintiff must demonstrate a likelihood of success. To demonstrate a likelihood of success, Plaintiff must make a clear showing that it is likely to succeed at trial; however, Plaintiff "need not show a certainty of success." Pashby, 709 F.3d at 321.

### 1. Breach of Contract/Specific Performance – Failure to Post Collateral Security[3]

Plaintiff's first claim alleges that Defendants breached the Indemnity Agreement by failing to post any collateral security in response to Plaintiff's April 6 demand letter. Plaintiff seeks an order of specific performance requiring Defendants, jointly and severally, to immediately post collateral security in the amount of $1,519,010.74.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000). When the language of a contract is plain and unambiguous, there is no room for construction—the contract must be interpreted and enforced as written. State v. Philip Morris USA Inc., 685 S.E.2d 85,

---

[3] In the TRO, the Court analyzed this claim as if it sought specific performance of the third paragraph of the Indemnity Agreement. During the preliminary injunction hearing, Plaintiff made clear that this claim seeks specific performance of the second paragraph of the Indemnity Agreement, and it is pursuant to the second paragraph that Plaintiff seeks collateral security from Defendants.

9

91 (N.C. 2009).

Plaintiff has come forward with evidence that the Indemnity Agreement constitutes a valid contract between the parties. Under the second paragraph of the Indemnity Agreement, Defendants agreed to indemnify Plaintiff from all losses, costs, and expenses that Plaintiff may incur by reason of having executed the bonds on behalf of Defendants, and Defendants agreed to do so on Plaintiff's demand as soon as liability existed or was asserted against Plaintiff. (Doc. No. 1-1, ¶ 2.) According to the express terms of the contract, Plaintiff is the sole determiner of the amount Defendants must pay. (Doc. No. 1-1, ¶ 2.) Liability was asserted against Plaintiff when CED made a payment bond claim in the amount of $335,757.77. (Doc. No. 1-9.) Thereafter, Plaintiff demanded from Defendants collateral in the amount of the claim in the form of cash or an irrevocable letter of credit issued by a bank approved by Plaintiff. (Doc. No. 1-10.) Defendants have neither responded to Plaintiff's demand nor provided the collateral. (Doc. No. 1, ¶¶ 33–34.) Plaintiff has thus demonstrated that Defendants breached the Indemnity Agreement by failing to post collateral security.

Godwin argues that Plaintiff is not entitled to the remedy of specific performance as to him because he is unable to post collateral in the amount demanded by Plaintiff. "To obtain the remedy of specific performance for the breach, the plaintiff 'must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.'" First Nat'l Ins. Co. of Am. v. Sappah Bros., Inc., 771 F. Supp. 2d 569, 572 (E.D.N.C. 2011)

(quoting Ball v. Maynard, 645 S.E.2d 890, 896 (N.C. Ct. App. 2007)). "Specific performance may not be granted where the performance of the contract is impossible and specific performance will not be decreed against a defendant who is unable to comply with the contract even though the inability to perform is caused by the defendant's own act." Curran v. Barefoot, 645 S.E.2d 187, 195 (N.C. Ct. App. 2007) (quotation marks omitted).

Godwin submitted a declaration stating that he does not have the ability to pledge collateral in the full amount requested by Plaintiff or anywhere close to that amount. (Doc. No. 22-1, ¶¶ 5, 7.) That Godwin does not have sufficient assets to satisfy the entirety of Plaintiff's collateral demand does not relieve him of his obligation to pledge the collateral that he does have—indeed, Godwin's obligation to post collateral security is joint and several with Lee and GTE. Plaintiff has demonstrated a likelihood of success on its claim seeking specific performance of the collateral security provision.

### 2. Quia Timet and Injunctive Relief

In its second claim, Plaintiff seeks an injunction directing Defendants to allow Plaintiff to inspect GTE's books, records, and accounts, as well as to provide a full and complete accounting of any and all assets owned by GTE since July 24, 2019 and their disposition.

#### i. Records Inspection

The Indemnity Agreement plainly gives Plaintiff the right to inspect Defendants' books, records, and accounts at any time. (Doc. No. 1-1, ¶ 10.) Godwin

11

argues that Plaintiff is not likely to succeed on its records inspection request as to Godwin because Godwin is unable to produce GTE's records. In his April 24, 2020 declaration, Godwin stated that beginning on April 1, 2020, he was unable to access GTE's records through Sevrina. (Doc. No. 17-1, ¶ 7.) Godwin declared that he is unable to produce GTE's accounts and records to Plaintiff because he has been blocked from accessing such records. (Doc. No. 17-1, ¶ 12.) In the same declaration, however, Godwin stated that on April 6, 2020—after Godwin was unable to access GTE's records through Sevrina—Godwin was able to access GTE's payroll records through Paychex, GTE's online payroll processor. (Doc. No. 17-1, ¶ 8.) The payroll records constitute "books, records, and accounts" which Plaintiff has the right to examine and copy at any time under the tenth paragraph of the Indemnity Agreement, and Godwin's own declaration demonstrates that he is able to produce such records notwithstanding his conclusory statement to the contrary. In fact, Godwin produced such records to Oaks on April 16, 2020. (Doc. No. 11-3.) Therefore, Plaintiff is likely to succeed on its second claim to the extent it seeks access to GTE's records.

        ii.    <u>Accounting</u>

Plaintiff does not discuss its request for an accounting in its supporting brief. Plaintiff has not provided any evidence or argument as to how it is likely to succeed on its second claim seeking an accounting, and there is no express right to an accounting in the Indemnity Agreement. Absent evidence and legal authority supporting Plaintiff's right to an accounting, Plaintiff has not demonstrated it is

12

likely to succeed on its second claim insofar as that claim seeks an accounting.

### B. Irreparable Harm

Next, Plaintiff must demonstrate that it is likely to suffer irreparable harm in the absence of preliminary relief. Generally, irreparable harm is suffered when an award of monetary damages would be inadequate. XL Specialty Ins. Co. v. Truland, No. 1:14cv1058, 2014 U.S. Dist. LEXIS 119096, at *7 (E.D. Va. Aug. 21, 2014). "Courts routinely recognize that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages." First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 574 (quotation marks omitted). This is so because the surety "holds a bargained-for right to collateral security and, without enforcement of such right, assumes the risk of becoming a general unsecured creditor and of being unable to collect a subsequent judgment in its favor." Int'l Fid. Ins. Co. v. Waterfront Grp. NC, LLC, No. 3:11-cv-00116, 2011 U.S. Dist. LEXIS 116311, at *13 (W.D.N.C. Oct. 6, 2011). Therefore, Plaintiff has demonstrated that it is likely to suffer irreparable harm absent preliminary injunctive relief in the form of collateral security. First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 575 (concluding that plaintiff-surety was likely to suffer irreparable harm in the absence of preliminary injunctive relief in the form of collateral security); Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *10 (concluding that absent a preliminary injunction, plaintiff-surety was likely to suffer irreparable harm in the form of loss of collateral to satisfy defendants' collateral security obligation).

Plaintiff has also demonstrated that it is likely to suffer irreparable harm

13

absent immediate access to GTE's books and records. Without access to GTE's books and records, Plaintiff is "in the dark as to [its] chances of successful performance of the contract" and "ha[s] no idea whether and [to] what extent Defendants can satisfy their indemnity obligation." XL Specialty Ins. Co., 2014 U.S. Dist. LEXIS 119096, at *9 (entering a TRO requiring defendants to provide plaintiff-sureties with access to their books and records). In addition, without immediate access to GTE's books and records, Plaintiff is unable to ensure the bond claims from GTE's subcontractors and suppliers line up with GTE's books and records. Plaintiff has thus demonstrated a likelihood of irreparable harm absent immediate access to GTE's books, records, and accounts.

### C. Balance of Equities

Plaintiff must also demonstrate that the balance of equities tips in its favor. Absent preliminary relief enforcing the collateral security provision, Plaintiff "would bear the entire loss on the bond claims without being collateralized, a right to which it explicitly bargained in the indemnity agreement." Id. Granting preliminary relief in the form of collateral security and records access "would require Defendants to perform as they contractually-obligated themselves to do." Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *13. The balance of equities thus tips in favor of Plaintiff. XL Specialty Ins. Co., 2014 U.S. Dist. LEXIS 119096, at *9 (concluding that the balance of equities tipped in favor of surety-plaintiffs); First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576 (same); Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *13–14 (same).

14

### D. Public Interest

Last, Plaintiff must show that a preliminary injunction is in the public interest. "The public has an interest in ensuring that contracts are enforced." UBS PaineWebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002). "Furthermore, enforcing the collateral security provision of an indemnity agreement in the construction setting serves an important public interest: to encourage sureties to continue to provide bonds for public construction contracts." First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576. The public interest thus supports the issuance of preliminary injunctive relief in this case. First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576 (concluding that the public interest supported issuing a preliminary injunction directing defendants to deposit collateral security with surety-plaintiff); Int'l Fid. Ins. Co., 2011 U.S. Dist. LEXIS 116311, at *14 (same).

\* \* \*

Therefore, the Court will issue a preliminary injunction, the complete terms of which are set forth below, prohibiting Defendants from transferring or encumbering assets that could be pledged as collateral under the Indemnity Agreement, directing Defendants to allow Plaintiff full and complete access to all financial books, records, and accounts maintained by or on behalf of GTE, and directing Defendants to deposit collateral with Plaintiff in the amount of $1,519,010.74. The $1,519,010.74 in collateral corresponds to: (a) CED's payment bond claim for $335,757.77; (b) the anticipated performance bond claim from CPCC for $1,020,261.45; (c) Nixon's Notice of Intent to File a Claim of Lien for $64,087.24; and (d) the unpaid invoices from

Shealy totaling $98,904.28.

     **E.    Bond**

Rule 65(c) states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond is within the district court's discretion. Pashby, 709 F.3d at 332. In determining the amount, "the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999).

The Court concludes, in its discretion, that a $10,000.00 bond is appropriate.

### III.    MOTION TO EXPEDITE DISCOVERY

Plaintiff seeks to serve a document subpoena on Sevrina, the accounting firm that maintains certain books and records for GTE. Under Rule 26(d)(1), a party may not seek discovery from any source before the parties conduct their Rule 26(f) conference absent an exception under the Federal Rules of Civil Procedure, a stipulation by the parties, or a court order. "In evaluating [a] request for expedited discovery, courts have applied either a reasonableness or good cause test that takes into account the totality of the circumstances or a modified preliminary injunction test." Tribal Casino Gaming, Enter. v. W.G. Yates & Sons Constr. Co., No. 1:16cv30, 2016 U.S. Dist. LEXIS 78557, at *8 (W.D.N.C. June 16, 2016).

16

Here, Plaintiff has shown good cause for the limited expedited discovery it seeks. The discovery is narrowly tailored to GTE's records maintained by Sevrina, which Plaintiff has a contractual right to examine and copy at any time. Access to Sevrina's records will aid Plaintiff in ensuring that any bond claims line up with GTE's records. In addition, Godwin consents to the motion. (Doc. No. 21.) Therefore, the Court grants Plaintiff's motion to expedite discovery.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's motion for a preliminary injunction, (Doc. No. 5), is **GRANTED in part** and **DENIED in part**:

1. Defendants and their officers, agents, servants, employees, and attorneys, and anyone acting in concert with them, are hereby restrained and enjoined from selling, transferring, disposing of, or otherwise diverting or encumbering any assets that could be pledged as collateral pursuant to the Indemnity Agreement, except as to necessary expenses paid in the ordinary course of business.

2. Within **ten (10) days** of the date of this Order, Defendants are **ORDERED** to allow Plaintiff full and complete access to all financial books, records, and accounts that are maintained by or on behalf of GTE.

3. Within **thirty (30) days** of the date of this Order, Defendants are **ORDERED** to deposit with Plaintiff the sum of $1,519,010.74 in certified funds or, alternatively, to provide property to (or liens and security interests in property for the benefit of) Plaintiff, such total value to equal

17

or exceed $1,519,010.74.

4. This relief is conditioned upon Plaintiff posting a bond in the amount of $10,000.00.

**IT IS FURTHER ORDERED** that Plaintiff's motion to expedite discovery, (Doc. No. 7), is **GRANTED**.

Signed: May 18, 2020

Robert J. Conrad, Jr.
United States District Judge